MICHAEL A. SWEET (SBN 184345)
**FOX ROTHSCHILD LLP**
345 California Street, Suite 2200
San Francisco, CA 94104
Telephone      (415) 364-5540
Facsimile:      (415) 391-4436
Email: msweet@foxrothschild.com
Attorneys for the
Official Committee of Unsecured Creditors

Richard A. Lapping (SBN: 107496)
**TRODELLA & LAPPING LLP**
540 Pacific Avenue
San Francisco, CA 94133
Telephone:      (415) 399-1015
Facsimile:      (415) 651-9004
Email: Rich@TrodellaLapping.com

Tracy Green (SBN: 114876)
**WENDEL, ROSEN~~, BLACK & DEAN~~ LLP**
1111 Broadway, Suite 2400
Oakland, CA 94607-4028
Telephone:      (510) 834-6600
Facsimile:      (510) 834-1928
Email: tgreen@wendel.com

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re: | Case No. 19-41025-WJL |
| ANKA BEHAVIORAL HEALTH, INCORPORATED, | Chapter 11 |
| Debtor. | **DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF LIQUIDATION JOINTLY PROPOSED BY DEBTOR AND COMMITTEE Dated September 16, 2019**~~Hon. William J. Lafferty, III~~ |
| | Hon. William J. Lafferty, III |

# I. INTRODUCTION

This is the disclosure statement (the **"Disclosure Statement"**) describing the Plan of Liquidation Jointly Proposed By Debtor And Committee dated ~~July 25~~September 16, 2019 (the **"Plan"**), which as the title indicates, is jointly proposed by ANKA Behavioral Health, Inc. (**"ANKA"** or the **"Debtor"**), debtor in possession in the above-captioned chapter 11 case (the **"Bankruptcy Case"**), and the Official Committee of Unsecured Creditors (the **"Committee"**). The Debtor and the Committee are also referred to as the Proponents. This Disclosure Statement also contains information about the Debtor. A full copy of the Plan accompanies this Disclosure Statement.

**Your rights may be affected. You should read the Plan and the Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.**

The Proponents believe that the Plan provides the best possible recoveries for creditors that can be achieved in any reasonable time frame (**_but see Risk Factors, Article IV above_**) and that possible alternatives are likely to result in delayed distributions and diminished recoveries for creditors. Therefore, the Proponents urge all Holders of Claims in Classes 2, 3 and 4 to vote to accept the Plan.

## A. Purpose of this Document

The Disclosure Statement describes the Debtor and significant events leading up to and occurring during the bankruptcy case; how the Plan proposes to treat claims of the type you hold (i.e. what you will receive on your claim if the Plan is confirmed); who can vote on or object to the Plan; what factors the Bankruptcy Court will consider when deciding whether to confirm the Plan; why the Debtor believes that the Plan is feasible and how the treatment of your claim under the Plan compares to what you would receive on your claim in a liquidation; and the effect of confirmation of the Plan.

Following the background discussion in Part II, the detailed and technical description of the terms of the Plan in Part III, the discussion of risk factors in Part IV and tax consequences in

2

Part V, the Disclosure Statement will discuss in Part VI.D. below the main choice that creditors will be deciding in voting on the Plan, and the Court will be deciding in confirming the Plan, namely, **whether it is in the best interest of creditors (a) to confirm the Plan and manage the remaining case duties under the supervision of the existing Committee or (b) to delegate the collection of receivables, the prosecution of avoidance actions, and the pursuit of recovery of insurance proceeds to a Court-appointed and Court-supervised trustee.**

**Be sure to read the Plan as well as the Disclosure Statement. The Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.**

**B.     Deadline for Voting and Objecting; Date of Plan Confirmation Hearing**

The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

**1.     Time and Place of the Hearing to Confirm the Plan**

The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place on **TBD**, at **TBD**, in Courtroom 220, before the Honorable Judge William J. Lafferty III, located at the United States Bankruptcy Court, Northern District of California, 1300 Clay Street, Oakland, California.

**2.     Deadline for Voting to Accept or Reject the Plan**

If you are entitled to vote to accept or reject the Plan, vote on the enclosed ballot and return the ballot via U.S. Post, courier service, facsimile or email **so that it is received no later than TBD** by: WENDEL, ROSEN, ~~BLACK & DEAN~~ LLP, Attn: Tracy Green, 1111 Broadway, Suite 2400, Oakland, CA 94607-4028; Facsimile: (510) 834-1928; Email: tgreen@wendel.com.

See below, section IV(A), for a discussion of voting eligibility requirements. **Your ballot must be received by TBD or it will not be counted.**

**3.     Deadline for Objecting to Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court

3

and served by **TBD**.

### 4. Identity of Person to Contact for More Information

If you want additional information about the Plan, you should contact: Richard A. Lapping, TRODELLA & LAPPING LLP, 540 Pacific Avenue, San Francisco, CA 94133; Email: Rich@TrodellaLapping.com.

### C. Disclaimer

**The Court has provisionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation by the Court that it be accepted.**

## II. BACKGROUND

### A. Description of the Debtor and Events Leading to Chapter 11 Filing

ANKA is a 501(c)(3) non-profit behavioral healthcare corporation that operated since 1973. It earned national recognition as a result of its ability to design, implement, and operate exceptional, innovative programs. Over the course of a year, ANKA served nearly 15,000 individuals and their families and generally had 200-300 clients at any one time at over 50 facilities that it operated throughout California and Michigan. ANKA had residential and Intensive Outpatient Programs (IOP) located in Contra Costa, Alameda, Solano, Sonoma, Santa Clara, Fresno, San Luis Obispo, Santa Barbara, Ventura, Los Angeles, Riverside Counties and Michigan.

Before bankruptcy, ANKA employed almost 1,000 professional and specialized staff members and independent contractors across the states of California and Michigan. Its philosophy was to treat the whole person by fully integrating care of both mind and body, always using clinically-proven, psycho-social models designed to promote health and wellness while containing costs. It offered the best and newest treatment methods for those seeking help in a warm and supportive environment. ANKA provided crisis residential treatment, transitional residential

4

Active\102192604.v2-9/11/19

treatment, long-term residential treatment, outpatient services, forensic programs and vocational services. Its specific programs included the following:

- Crisis Residential Treatment for Children & Adults with Co-Occurring Disorders
- Substance Use Treatment Programs
- Residential Programs for Children & Adults with Intellectual Disabilities
- Care/Drop-In Centers
- Forensic Outpatient & Residential Services
- Independent & Supportive Housing
- Mental Health Rehabilitation Centers
- Veterans Services
- Assertive Community Treatment/Full-Service Partnerships Programs
- Transitional Residential for Co-Occurring Disorders
- Eating Disorder Treatment
- Homeless Continuum of Care
- Day Programs/Outpatient Services
- Vocational Services
- Emergency Shelter Services
- U.S. Probation Mental Health Assessment
- Outreach & Engagement

ANKA commenced this bankruptcy case so that it could undertake an orderly wind down of all of its residential and outpatient treatment programs. It worked closely with the California Department of Developmental Services, regional centers, and county mental health agencies to ensure that all of the needs of the patients were met. ANKA's goal was to transition all of the locations to other providers without closing any facilities to ensure that there was no interruption in patient services, and that the employees continued to work at the same locations since they have the knowledge and relationships with the patients. The Company was committed to an orderly and complete transition of its clients and patients to alternate providers before terminating

5

Active\102192604.v2-9/11/19

any service or closing any facility.

The bankruptcy was necessitated because some vendors threatened to discontinue services, and without those services, ANKA could not operate its business.  Additionally, ANKA's financial obligations had grown to a point where its net income from operations would never be sufficient to satisfy even a small portion of its obligations. ANKA's financial difficulties primarily arose because of unexpected losses associated with ANKA's expansion into new developmental disabilities service programs.  The licenses for the new locations were unexpectedly delayed due to new regulations and could not be operated for significant periods while expenses accrued immediately.  The commencement of this bankruptcy case provided ANKA with the ability to orderly transfer its patients to other providers while making current payments to creditors.

### B.  Significant Events During the Bankruptcy Case

ANKA commenced the Bankruptcy Case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on April 30, 2019 (the **"Petition Date"**).  The Debtor continues to operate its business, manage its financial affairs, and operate its bankruptcy estate as a debtor in possession.  As explained below, Debtor's current business operations have been substantially reduced and consist of collection of accounts receivable, and administrative activity associated with this bankruptcy and the wind-down of the Debtor's business.  On June 3, 2019, July 8, 2019 and July 22, 2019, the Meeting of Creditors was held and concluded.

### Appointment of Creditors Committee

On May 8, 2019, the Official Committee of Unsecured Creditors was appointed by the Office of the United States Trustee in the Bankruptcy Case.  The three members of the Committee are Health Information Technology Care, LLC, Berkshire Hathaway Homestate Insurance Company, and CallTower, Inc.

### Employment of Professionals

On May 21, 2019, the Bankruptcy Court approved the appointment of Trodella & Lapping LLP and Wendel, Rosen, Black & Dean LLP as co-counsel for the Debtor.  On May 30, 2019, the Bankruptcy Court approved the appointment of BPM, LLP as financial advisor to the

6

Active\102192604.v2-9/11/19

Debtor. On June 14, 2019 the Bankruptcy Court approved the appointment of Fox Rothschild LLP as attorneys for the Committee. On May 10, 2019 the Bankruptcy Court directed the appointment of a Patient Care Ombudsman. On May 17, 2019, the Office of the United States Trustee appointed David N. Crapo to that position, which appointment was approved by the Bankruptcy Court on June 3, 2019.

### **Transfer of Debtor's Patients and Termination of Operations**

Since the commencement of this case, the Debtor has transitioned all of its patients to other providers. Although most of the patients were transitioned to other providers who took over the Debtor's locations, some were moved to other providers because the counties chose to close the facilities. Many of the ANKA employees were retained by the new companies that came in to operate at the facilities.

In connection with the transfer of patients, the Debtor rejected all of its leases of real property for its facilities and rejected numerous contracts between Debtor and various state, county, and private payor agencies ("**Payor Agencies**") whose patients were treated at Debtor's facilities under various programs of the Payor Agencies.

### **Cash Collateral Stipulation and Collection of Receivables**

Prior to filing bankruptcy, the Debtor had entered into secured credit agreements in favor of the Bank of Guam (the "**Bank**"), in the original aggregate principal amount of $8,898,900. Each of the Credit Agreements is secured by and a Security Agreement executed by the Debtor in favor of the Bank, whereby each Credit Agreement is secured by certain Collateral (as defined in the Security Agreements) consisting of all assets of the Debtor of any kind or nature, including but not limited to all accounts receivable, claims, choses in action, policies and the proceeds of policies for insurance of every kind, general intangibles, equipment, furniture and fixtures (the "Collateral"). The Bank's liens were duly perfected by filing financing statements under the Uniform Commercial Code.

On the Petition Date, the Bank's Collateral, and in particular, cash collateral consisting of Debtor's accounts receivable, were the only source of income that allowed the Debtor

7

to operate in chapter 11.  In order for the Debtor to use the cash collateral, the Debtor and the Bank entered into a stipulation to that effect that was approved by the Court in two Cash Collateral Orders (defined in **Exhibit 1** hereto) on an interim and then final basis.  In essence, to the extent that the accounts receivable generated and collected by the Debtor after the Petition Date are less than the receivables generated prior to the Petition Date, then the Bank gets a replacement lien such that the value of its Collateral as of the Petition Date does not decrease due to Debtor's activities during the Bankruptcy Case.  On the Petition Date, the Debtor estimates that its collectible accounts receivable were at least $4,000,000.

In addition to the liens on the accounts receivable, the Bank's Claim (defined below) is also supported by guarantees by Debtor's two wholly-owned subsidiaries AP&H, Inc. and ANKA MHSA Holding Company LLC (the **"Subsidiaries"**) and also secured by the real property owned by the Subsidiaries.  The Debtor is cooperating with the Bank to sell the real property owned by the Subsidiaries and will be applying the net proceeds to reduce the Bank's Claim.

~~Pursuant to the Cash Collateral Orders, the Committee was granted the 90 Day Challenge Period (from June 14, 2019 to September 12, 2019) during which the Committee may challenge, seek to avoid or otherwise object to the Bank Claim.  The Committee is currently in the process of investigating all potential challenges to the Bank Claim.~~

During the Bankruptcy Case and as of the date of this Disclosure Statement, the Debtor has paid $1,904,296.99 to the Bank from the proceeds of accounts receivable, and the Subsidiaries have paid the Bank $69,773.05 from the proceeds of the sale of real property.  As of July ~~23~~29, 2019, the Bank's Claim is approximately ~~$_____.~~$5,172,037.82, and the Debtor's collectible accounts receivable are estimated to be $ 2,050,976.35.

**Mediation and Settlement Agreement with the Bank**

In August, 2019, the Bank objected that the amounts in the cash collateral stipulation approved by the Cash Collateral Orders to be paid to the Bank from the collection of accounts receivable had fallen short by $700,000 and that the Debtor had continued to use cash collateral following the expiration of the approved budget without the Bank's consent or Court order, and

8

Active\102192604.v2-9/11/19

alleged that as a result of this and other factors the Debtor had breached the stipulation, and refused to consent to the Debtor's further use of cash without a new agreement. On August 26, 2019, the Bank, the Debtor, and the Committee attended a mediation with Randy Michelson, a member of the Northern District of California Bankruptcy Dispute Resolution Panel and, as a result, agreed to a settlement that included in summary, the Bank's support for the current Plan, and the following terms:

1.  The amount of the Bank's prepetition claim at the date the case commenced would be capped at $7,050,000, which includes a waiver of its rights to attorneys' fees.

2.  The Bank's secured claim against accounts receivable to be collected after September 1, 2019, would be capped at $682,000.

3.  The Bank agreed to the cost of employing the Debtor's CEO until November 1, 2019, and other collections personnel pursuant to a new budget.

4.  The parties agreed that all further accounts receivable collections would be allocated 60% to the Bank, up to $682,000, 37% to the professional fee carve out that had not been funded, up to $250,000, and 3% to an unsecured creditors fund that cannot be used for any other purpose except distributions to unsecured creditors, no limit on amount.

5.  If the allocation to the Bank falls short of $682,000, then the difference, equal to the Bank Gap Claim in the Plan, will be treated as a secured claim against funds recovered in actions on avoidable transfers and insurance proceeds, described below, up to the amount of the Bank Gap Claim, if any.

6.  The Bank agreed to consent to all past use of cash collateral, and future use under the new budget to be agreed upon between the Debtor and the Bank.

7.  The Committee agreed to withdraw any potential challenge that the Bank's prepetition claim was not duly perfected.

8.  The Bank agreed to support the current Plan provided it contained the agreed terms.

9.  The Bank agreed to release the Debtor and Committee (and their professionals) from the various allegations alleged with respect to the Bank's objections to the Debtor's use of

9

1     cash collateral.

2     10.  The Committee granted a general release in favor of the Bank.

3     11.  The Debtor granted a general release in favor of the Bank and the Committee.

4 This agreement resulted in a formal settlement agreement that was submitted to the Court for

5 approval, and said settlement agreement was approved by the Court.

6                        **Accounts Receivable Collections**

7         Due to the nature of the Debtor's business, the collection of accounts receivable

8 requires access to confidential patient information maintained by Debtor that was reported to the

9 Payor Agencies to support the Debtor's billings.  The confidentiality of patient information is

10 governed by the HIPAA Privacy Rule of the federal Department of Health and Human Services

11 under the Health Insurance and Portability Accountability Act (**"HIPAA"**), and analogous

12 California statutes and regulations.  All staff involved on behalf of the Debtor in the management

13 and collection of accounts receivable must be and currently are certified to be HIPAA qualified.  In

14 addition, many of Debtor's contracts with Agency Payors are "cost plus" contracts, meaning the

15 Debtor is required to collect and submit the eligible costs in order to justify its reimbursement.  The

16 Debtor's efforts to comply with the various billing protocols and collect the remaining outstanding

17 receivables are important to cost-effectively reducing the Bank's Claim, which has a secured and

18 unsecured component, and thus improving the recoveries of all unsecured creditors.

19                        **Records Management**

20         Title 22, Division 5, § 70001 and following of the California Code of Regulations,

21 contain provisions that require health care providers to keep patient records for a minimum of seven

22 years or three years after a juvenile has turned 18, whichever is longer, and to provide access to

23 patients, insurers and government agencies on request.  At the Petition Date, the Debtor's patient

24 records consisted of voluminous paper records commingled with non-patient records stored in

25 facilities in northern and southern California and in the locations of the former facilities.  Since

26 2016, the Debtor's records have been maintained electronically.  During the Bankruptcy Case, the

27 Debtor's staff have been taking the paper records out of storage, destroying records that are not

28                                       10

required, and indexing the remainder for storage, future access, and timed destruction when permitted.

The Debtor is seeking to arrange for a HIPAA qualified company to store the patient records and provide access to future requestors for a fee as permitted by the regulations. The cost of this has not been determined but will be an administrative expense of the Bankruptcy Case.

### Professional Fees

Professionals for the Debtor and the Committee filed applications to approve fees and expenses through July 31, 2019, that were heard by the Court on August 28, 2019. The Court approved the applications of the Patient Care Ombudsman and DRC in full. As to the other professionals, the Court approved 70% of the fees and reserved judgment as to 30% pending further developments in the case.

| Applicant | Final/Interim | Fees | Expenses | Total |
|---|---|---|---|---|
| Patient Care Ombudsman | First and Final | $24,840.00 | $153.50 | $24,993.50 |
| DRC – Schedules & Noticing | Interim | $20,746.00 | $0.00 | $20,746.00 |
| BPM Financial Advisor | Interim | $86,888.50 | $0.00 | $86,882.50 |
| T&L - Debtor's counsel | Interim | $62,675.00 | $611.28 | $63,286.28 |
| Fox Rothschild-for Committee | Interim | $148,771.50 | $903.42 | $149,674.92 |
| Wendel Rosen for Debtor | Interim | $249,135.00 | 2,391.29 | $251,526.29 |
| **TOTAL** | | | | **$597,109.49** |

Professional fees continue to accrue and will be subject to further review by the Court. The Monthly Operating Report for August reflects additional professional fees for August totaling $_____.

### C. Recovery of Avoidable Transfers and Insurance Proceeds

The Bankruptcy Code permits the Debtor or a designee, including the Liquidation Trustee under the Plan, to recover certain transfers such as preferences (a payment or other transfer to an unsecured creditor within 90 days of the bankruptcy) where the aggregate amount transferred is at least $6,425. The Debtor and the Committee have performed a preliminary analysis of payments within 90 days of the bankruptcy and, excluding payments that will not qualify due to amount, and payments that will be deemed ordinary course or on their face will not qualify, such as payroll, pension contributions, secured debt payments, and advance payments to professionals, the total

11

Active\102192604.v2-9/11/19

payments potentially recoverable appear to exceed $3,000,000.  Actual recoveries are likely to be less, but the Debtor and the Committee have not yet completed ~~an~~the investigation with regard to these prepetition transactions, ~~including preferences~~ and other potentially avoidable transfers. Recoveries of avoidable transfers ~~are not subject to the Bank's liens and, therefore,~~ may form a pool of assets that can be distributed to unsecured creditors.

In addition to the above, the Debtor had a policy of insurance for claims made against its officers ~~and directors~~ with an aggregate limit of $5 million (the **"D&O Insurance"**).  The Committee and the Bank have notified the Debtor of potential claims that may be covered by the D&O Insurance, and the Debtor duly and timely tendered these claims to the insurance broker and the issuer of the D&O Insurance policy.  The validity and value of such claims is unknown.  Any recoveries of insurance proceeds may also become part of the pool of assets that can be distributed to unsecured creditors.

### D.  Current Financial Condition

Apart from potential recovery of avoidable transfers and D&O Insurance proceeds, the Debtor has no significant assets that can be monetized for distribution to unsecured creditors.

## III.    SUMMARY OF THE PLAN AND TREATMENT OF CLAIMS

### ARTICLE I

### DEFINED TERMS AND RULES OF INTERPRETATION

The defined terms and rules of interpretation are attached at the end of the Disclosure Statement as **Exhibit 1**.

### ARTICLE II

### CLASSIFICATION OF CLAIMS

**2.1**    **Unclassified Claims**.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

**2.2**    **Classification of Claims**.  A Claim shall be included in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be classified in a different

12

Class or Classes to the extent that any remainder of such Claim qualifies for the description of such different Class or Classes. A Claim is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled before the Effective Date. The Bankruptcy Court shall have exclusive jurisdiction over any dispute concerning the classification of Claims, and resolution of any such dispute shall not be a condition precedent to entry of a Confirmation Order or consummation of the Plan. The Claims against the Debtor are classified as follows:

(i) **Class 1 – Non-Tax Priority Claims**. Class 1 Claims consist of all Allowed Claims that are Non-Tax Priority Claims, if any.

(ii) **Class 2 – Secured Bank Claim**. Class 2 Claims consist of the Allowed Bank Claim that is a Secured Claim.

(iii) **Class 3 – Unsecured Claims**. Class 3 Claims consist of all Allowed Claims that are General Unsecured Claims, including Claims that are allowed pursuant to order of the Bankruptcy Court, Claims allowed pursuant to sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, and deficiency Claims allowed pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012.

(iv) **Class 4 – Other Secured Claims**. Class 4 Claims consist of all Allowed Claims that are Other Secured Claims.

## ARTICLE III

## TREATMENT OF CLAIMS

**3.1** **Unclassified Claims**.

(i) *Administrative Claims*. Each Holder of an Allowed Administrative Claim entitled to priority pursuant to sections 507(a)(2) or 507(b) of the Bankruptcy Code shall be paid by the Disbursing Agent in full, without interest, or on such other terms as may be agreed upon by such Holder and the Debtor or the Liquidation Trustee, on the Effective Date or as soon thereafter as may be practicable, *provided*, *however*, that if such Holder's Administrative Claim is (a) disputed as to amount, validity, priority or enforceability or (b) subject to setoff by reason of an action that is or may

13

Active\102192604.v2-9/11/19

be brought by the Debtor or the Liquidation Trust, or otherwise, then such Administrative Claim shall be payable only to the extent allowed by order of the Bankruptcy Court.  Furthermore, no payment on account of an Administrative Claim for a Professional's fees allowable pursuant to sections 330 and 331 of the Bankruptcy Code and Bankruptcy Rule 2016, or any other applicable provision shall be made until such Claim is Allowed by order of the Bankruptcy Court.  Bankruptcy fees accrued and payable pursuant to 28 U.S.C. § 1930 through and including the Effective Date shall be paid in full on or before the Effective Date.  The Estate Professionals have agreed that their Estate Professional Fee Claims shall be paid from the Professional Fee Fund.

(ii)      ***Priority Tax Claims***.  Each Holder of an Allowed Claim for taxes entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code shall be paid by the Disbursing Agent in full, without interest, or on such other terms as may be agreed upon by such Holder and the Debtor or the Liquidation Trustee, on the Effective Date or as soon thereafter as may be practicable.

**3.2**      **Unimpaired Classes of Claims**.

(i)      ***Class 1 Non-Tax Priority Claims***.  Class 1 Claims are not Impaired under the Plan.  Under the Plan, each Holder of an Allowed Non-Tax Priority Claim shall be paid by the Disbursing Agent in full, without interest, or on such other terms as may be agreed upon by such Holder and the Debtor, on the Effective Date.

**3.3**      **Impaired Classes of Claims**.

(i)      ***The Class 2 ~~Secured~~ Bank Claim***.  The Class 2 Bank Claim is Impaired under the Plan.  The Class 2 Bank Claim shall be an Allowed Claim in the amount of $7,050,000.00.  Under the Plan, the Holder of the Allowed Class 2 Bank Claim shall: (a) ~~subject to the Committee's and/or Liquidation Trustee's rights to challenge the Bank Liens during the 90-Day Challenge Period and prosecute to conclusion any challenge brought during the 90-Day Challenge Period,~~ (i) retain past the Effective Date its pre-Petition Date Liens on the Bank Collateral and its Replacement Liens on the Replacement Lien Collateral, and (ii) retain all payments or other distributions made by the Debtor to the Bank prior to the Effective Date ~~to~~, including all proceeds received from the ~~extent that such payments or other distributions are~~liquidation of the Bank A/R Collateral ~~in which~~and all proceeds

14

received from the Bank has an unavoidable Lien;Real Property Collateral (collectively the "**Bank Pre-Effective Date Payments**"); and (b) receive on the Effective Date, or as soon thereafter as may be practicable, but in any event, after the conclusion of the 90-Day Challenge Period and the prosecution of any challenge brought during the 90-Day Challenge Period, the Liquidation (i) the Specific Liquidation Proceeds of the Bank Collateral and the Replacement LienReal Property Collateral. and (ii) the difference, if any, between (x) $682,000.00 and (y) the Bank Pre-Effective Date Payments received between September 1, 2019 and the Effective Date (the "**Bank Gap Claim**"). Commencing on the Effective Date, until the date that the Bank Gap Claim has been satisfied in full, the Liquidation Trustee shall distribute to the Bank: (i) 60% of the Aggregate Liquidation Proceeds until the Professional Fee Fund has been funded up to the Professional Fee Carve Out Fund Cap; and, then, thereafter (ii) 97% of the Aggregate Liquidation Proceeds. Promptly after the date that the Bank Gap Claim has been satisfied in full, the Bank shall release its Liens on all Bank Collateral other than the Bank Real Property Collateral. Any balance of the Class 2 Bank Claim, to the extent not secured by the Bank Collateral or Replacement Lien Collateral or not satisfied from the Specific Liquidation Proceeds of such collateralthe Bank Real Property Collateral Proceeds, the Bank Pre-Effective Date Payments and/or payments received on the Bank Gap Claim, shall be treated as a Class 3 Claim. (the "Bank Unsecured Claim").

> (ii)     *Class 3 General Unsecured Claims*. Class 3 Claims are Impaired under the Plan. Under the Plan, each Holder of an Allowed Claim that is a General Unsecured Claim shall receive on the Effective Date, or as soon thereafter as may be practicable, an amount equal to such Holder's pro rata share of the Liquidation Proceeds remaining after payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, and Allowed Secured ClaimsUnsecured Claim Fund. The Bank Unsecured Claim shall be Estimated for purposes of voting on the Plan; *provided, however*, that the Bank shall receive no distributions from the Unsecured Claim Fund on account of the Bank Unsecured Claim until the Bank Gap Claim has been satisfied in full and the Bank has received all Specific Liquidation Proceeds of the Bank Real Property Collateral, such that the actual amount of the Bank Unsecured Claim can be determined; rather,

15

Active\102192604.v2-9/11/19

amounts for distribution on account of the Bank Unsecured Claim shall be reserved and held using the Estimated amount of the Bank Unsecured Claim for the purposes of calculating the reserve.

(iii)     *Class 4 Other Secured Claims*.  Class 4 Claims are Impaired under the Plan. Under the Plan, each Holder of an Allowed Other Secured Claim shall, at the election of the Liquidation Trustee, (a) have the collateral securing its Secured Claim abandoned to it, (b) be entitled, upon the Effective Date, to exercise any and all rights related to (i) foreclosure and realization upon its collateral, or (ii) setoff under Bankruptcy Code § 553, as the case may be, or (c) be paid the amount of its Allowed Other Secured Claim in full, in Cash, on or as soon as practicable after the later of (i) the Effective Date, (ii) the date any such Claim becomes an Allowed Claim, or (iii) the date on which sufficient Net proceeds are generated from the ~~Disposition~~disposition of the collateral securing such Claim. Any balance of a Class 4 Claim, to the extent not secured by Collateral or not satisfied from the Liquidation Proceeds of such collateral, shall be treated as a Class 3 Claim.

**3.4** **Retention of Defenses and Rights of Setoff Regarding Claims**.  Except as otherwise provided in the Plan or settlement agreements approved by the Court, nothing shall prejudice the Debtor's, the Liquidation Trustee's and the Disbursing Agent's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights of setoffs or recoupment with respect to such Claims.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

**4.1** **Impaired Classes of Claims Entitled to Vote**.  Subject to Section 4.5 of the Plan, the Holders of the Class 2 ~~Secured~~ Bank Claim, Class 3 General Unsecured Claims, and Class 4 Other Secured Claims are entitled to vote to accept or reject the Plan.

**4.2** **Acceptance by Impaired Classes**.  In accordance with section 1126(c) of the Bankruptcy Code and except as provided under sections 1126(e) & (g) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

16

**4.3** __Acceptance by Unimpaired Classes and Unclassified Claims__.  Pursuant to section 1126(f) of the Bankruptcy Code, each Unimpaired Class of Claims is presumed to have accepted the Plan and, therefore, votes to accept or reject the Plan will not be solicited from such Classes.  Holders of Class 1 Allowed Non-Tax Priority Claims will be paid in full on the Effective Date.  To the extent that a Holder of a Class 1 Non-Tax Priority Claim does not file a timely and proper objection to the Plan in accordance with the requirements set forth herein, such Holder may be deemed to have accepted the treatment as set forth in Article III of the Plan.

**4.4** __Cramdown__.  If any Impaired Class of Claims entitled to vote shall not accept the Plan by the requisite majorities provided in section 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Plan Proponents reserve the right to (i) amend the Plan, or (ii) to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or (iii) both amend the Plan and seek Confirmation of any amended plan pursuant to section 1129(b) of the Bankruptcy Code.

**ARTICLE V**

__IMPLEMENTATION OF THE PLAN__

**5.1** __Conditions to Effective Date__.  Unless waived by the Plan Proponents, the following are conditions precedent to the occurrence of the Effective Date: (a) the Confirmation Order, in a form reasonably satisfactory to the Plan Proponents, ~~that approves all of the terms and conditions of the Plan and all distributions to be made pursuant thereto,~~ shall have been entered by the Bankruptcy Court and shall be a Final Order, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; (b) no stay shall be in effect with respect to the Confirmation Order; and (c) all documents, agreements and instruments required for the consummation of the Plan shall have been executed, shall not be subject to dispute, and shall be valid and legally binding obligations of the parties thereto.  Until the foregoing conditions are satisfied or waived in accordance with the preceding sentence, the Estate shall remain vested in the Debtor as debtor in possession.

**5.2** __Funding__.  In accordance with sections 1123(a)(5)(D) and 1123(b)(4) of the Bankruptcy

17

Active\102192604.v2-9/11/19

Code, all Assets of the Estate shall be sold, otherwise liquidated, distributed, or abandoned. As of the Effective Date, the Liquidation Proceeds, and the Assets of the Estate, including all Cash of the Estate, shall be transferred, conveyed and assigned to the Liquidation Trust.

**5.3** **Liquidation Trust**. On or before the Effective Date, the Debtor shall establish a liquidation trust in accordance with the Liquidation Trust Agreement. On the Effective Date, the Debtor shall be deemed to have transferred the Liquidation Proceeds and all other Assets of the Estate to the Liquidation Trust pursuant to the terms of the Liquidation Trust Agreement. A Liquidation Trustee acceptable to the Plan Proponents shall be appointed pursuant to the Liquidation Trust Agreement and shall be responsible for liquidating and administering the Trust Assets and for all distributions pursuant to the Plan. On the Effective Date, subject to approval of the Bankruptcy Court, the Liquidation Trustee shall become the appointed representative of the Estate in accordance with section 1123(b)(3) of the Bankruptcy Code, shall assume all liabilities of the Estate and shall pay such liabilities as provided under the Plan. Under the Liquidation Trust Agreement, the Liquidation Trustee shall report to, consult with, and generally be supervised by the Trust Oversight Committee, which shall consist of the current members of the Committee, and essentially be a continuation of the Committee after Confirmation. The members of the Trust Oversight Committee will serve without compensation, except for reimbursement of expenses.

**5.4** **Liquidation Trustee**. The Liquidation Trustee shall be a person who has previously qualified and served as a bankruptcy trustee, plan administrator or liquidating trustee in a case pendingfiled in the Northern District of California, and subject to Court Approvalapproval. The Liquidation Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Liquidation Trust Agreement. The Liquidation Trustee may retain counsel and other professionals as the Liquidation Trustee, in his or her sole discretion, deems appropriate, without further order of the Bankruptcy Court, to assist the Liquidation Trustee in performing his or her duties, rights and obligations under the Plan. At present, the Plan Proponents have nominated Lynn Schoenmann, an experienced bankruptcy trustee, to be the Liquidating Trustee subject to Court Approval, and Lynn Schoenmann has indicated that she will accept the appointment subject to her

18

Active\102192604.v2-9/11/19

final due diligence.

**5.5** **Disbursing Agent**. The Liquidation Trustee shall also serve as the Disbursing Agent for the purpose of implementing the Plan.

**5.6** **Liquidation Trustee's and Disbursing Agent's Rights, Powers and Duties**. On and after the Effective Date, as set forth in the Liquidation Trust Agreement, the Liquidation Trustee and Disbursing Agent shall have, among others, the following rights and powers (including all of the rights and powers of a trustee appointed under the Bankruptcy Code) with respect to the implementation of the Plan:

(i) To invest all Cash of the Liquidation Proceeds;

(ii) To make all required distributions under the Plan;

(iii) To employ, supervise and compensate Professionals retained to represent the interests of the Liquidation Trustee in connection with the Plan;

(iv) To make and file tax returns as required by applicable state, federal or local laws;

(v) To object to Claims Filed or otherwise asserted against the Debtor, the Estate and property of the Debtor or the Estate;

(vi) To seek an estimation of contingent or unliquidated Claims under section 502(c) of the Bankruptcy Code;

(vii) To seek the determination of the Debtor's tax liabilities under section 505 of the Bankruptcy Code;

(viii) To prosecute all Litigation Claims whether pending as of the Effective Date or commenced thereafter, including but not limited to any and all claims against the Debtor's former officers that are covered under policies of insurance;

(ix) To sell the Assets free and clear of all liens, claims and interests to the fullest extent provided in section 1123(a)(5)(D) of the Bankruptcy Code;

(x) To surcharge the Assets and their proceeds for costs of preservation and disposition to the fullest extent provided in section 506(c) of the Bankruptcy Code;

19

Active\102192604.v2-9/11/19

(xi)     To amend or modify the Plan in accordance with section 1127 of the Bankruptcy Code; and

(xii)    To file and prosecute such motions, applications or other pleadings in the Bankruptcy Court or other appropriate forum, and exercise all other powers and rights, and take all other actions necessary or appropriate to implement the Plan.

**5.7     <u>Exculpation and Indemnification of the Liquidation Trust and Liquidation Trustee</u>**.

**From and after the Effective Date, to the fullest extent permitted by applicable law, the Liquidation Trustee and each of the Liquidation Trustee's representatives shall not have and shall not incur any liability to any Person from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Liquidation Trustee by the Plan, the Liquidation Trust or any court order after the Effective Date pursuant to or in furtherance of the Plan, the Liquidation Trust or applicable law, or otherwise, except for willful misconduct or gross negligence as determined by a Final Order.  No Holder of a Claim, or any other party in interest, will have or pursue any claim or cause of action against the Liquidation Trustee, the Liquidation Trust or their respective representatives, for making payments or distributions in accordance with the Plan or for implementing the provisions of the Plan, except for claims of willful misconduct or gross negligence.  Any act or omission taken that is consistent with the provisions of the Plan, the Liquidation Trust or court order, will be conclusively deemed not to constitute gross negligence or willful misconduct.  To the fullest extent permitted by applicable law, the Liquidation Trust will indemnify, hold harmless, defend and reimburse the Liquidation Trustee and each of his or her designated representatives from and against any and all losses, claims, causes of action, damages, fees, expenses, liabilities and actions for any act or omission taken pursuant to the Plan, the Liquidation Trust or court order, except for willful misconduct or gross negligence as determined by a Final Order.  All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan and the closing of the Chapter 11 Case.**

20

Active\102192604.v2-9/11/19

**5.8    Post-Confirmation Management**.  From and after the Effective Date, the Liquidation Trustee shall manage the Liquidation Trust and control and perform all post-Confirmation responsibilities, including implementation of the Plan.  From and after the Effective Date, all fees shall be paid to the Liquidation Trustee and any other Professionals retained by the Liquidation Trustee without approval of the Bankruptcy Court.

**5.9    Record Date for Distributions**.  At 5:00 p.m. prevailing Pacific time on the Record Date, the transfer records for Allowed Claims shall be closed, and there shall be no further changes in the Holders of record of any Allowed Claims.  Neither the Debtor, the Liquidation Trustee nor the Disbursing Agent shall be obligated to recognize the transfer of any Allowed Claims after the Record Date but shall be entitled to recognize, for all purposes hereunder, only those Holders of record as of 5:00 p.m. prevailing Pacific time on the Record Date.

**5.10    Fractional Dollars; De Minimis Distributions**.  Notwithstanding any other provision of the Plan, (a) the Liquidation Trustee and Disbursing Agent shall not be required to make distribution or payments of fractions of dollars, and whenever any payment of a fraction of dollars under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar, with one-half (1/2) dollar being rounded down, and (b) the Liquidation Trustee and Disbursing Agent shall not have any obligation to make any distribution to a specific Holder of an Allowed Claim if the amount to be distributed to that Holder on the relevant Distribution Date is less than $10.

**5.11    Executory Contracts and Unexpired Leases**.  All executory contracts and unexpired leases that (i) the Debtor entered into prior to the Petition Date, (ii) are executory as of the Effective Date, and (iii) have not been assumed or rejected pursuant to section 365 of the Bankruptcy Code before the Effective Date, shall be deemed rejected as of the Effective Date; *provided, however*, that no such rejection shall occur as to any policies of insurance in force as of the Effective Date under which the Debtor is an insured.  Any Claim arising from such rejection under the Plan shall be filed within thirty (30) days of the Effective Date or forever be barred from recovery against the Estate.

**5.12    Disputed Claims**.  The Liquidation Trustee and Disbursing Agent reserve all rights to

Active\102192604.v2-9/11/19

prosecute any and all timely Filed objections to Claims, including Administrative Claims, after the Confirmation Date.  Any such objection shall be litigated to decision or settled after such notice and opportunity for hearing as shall be appropriate in the Bankruptcy Court's discretion.  Any such objection shall be commenced not later than the Claims Objection Deadline.  No disbursement shall be made on account of any Claim, including any Administrative Claims, as to which an objection has been interposed, or as to which a counterclaim or setoff has or may be asserted, unless and until the objection, counterclaim or setoff is resolved by a Final Order.  The Liquidation Trustee or Disbursing Agent shall reserve sufficient funds to satisfy any Disputed Claim to the extent provided for in the Plan.

**5.13**    **Effect of Appeals**.  Provided that the Confirmation Order is not stayed pending appeal, the Plan Proponents may consummate the Plan notwithstanding such pending appeal, or the timely service and filing of a motion pursuant to Bankruptcy Rules 7052, 7062, 8002(b), 8002(c), 8003, 8015, 9023 or 9024.

**5.14**    **Unclaimed Disbursements**.  All distributions made pursuant to the Plan that are not negotiated within ninety (90) days after the relevant Distribution Date and that consequently become unclaimed shall revert to and become property of the Liquidation Trust, free and clear of any and all Claims, Interests, demands and causes of action, but subject to further redistribution in accordance with the Plan.

**5.15**    **Injunction**.  **Except for such actions as Holders may take to prosecute or defend their respective Claims in the Bankruptcy Court, entry of a Confirmation Order will operate as an injunction against the commencement or continuation of an action, the employment of process, or any act to collect, recover or offset any Claim of any Holder until the entry of a final decree or the dismissal of the Chapter 11 Case.**

**5.16**    **Retention of Claims**.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Claims shall be retained, prosecuted and enforced by the Liquidation Trustee.

**5.17**    **Continued Corporate Existence**.  Subject to the provisions of the Plan, the Debtor shall continue to exist after the Effective Date as a separate corporation, in accordance with applicable

22

law and pursuant to its articles of incorporation as amended and in effect prior to the Effective Date, provided however, that the purpose of the Debtor shall be limited to taking such actions as are necessary to implement, and are consistent with implementing, the Plan. On the Effective Date, the Liquidation Trustee shall be deemed to be sole director of the Debtor. Any dispute as to the propriety of any action sought to be taken by the Debtor shall be resolved by the Bankruptcy Court. Subject to the provisions of the Plan, as soon as practicable after the Liquidation Trustee makes the final distribution of Cash under the Plan and the Liquidation Trust Agreement, the Liquidation Trustee shall effectuate the dissolution of the Debtor in accordance with applicable law. On the Effective Date, all Assets of the Debtor and the Estate shall vest in the Liquidation Trust.

**5.18** **Amendments, Modifications, Revocation and Interpretation of the Plan**. Before the Confirmation Date, the Plan Proponents may alter, amend, modify or withdraw the Plan at any time subject to section 1127 of the Bankruptcy Code. In the event that inconsistencies exist between the Plan and the Disclosure Statement, the Plan shall govern.

**5.19** **Exemption from Certain Transfer Taxes**. Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security or the making or delivery of any instrument of transfer under the Plan, including the transfer of the Liquidation Proceeds and all other property of the Estate to the Liquidation Trust, may not be taxed under any law imposing a stamp tax or similar tax. Any sale of any property of the Liquidation Trust occurring on or after the Effective Date shall be deemed to be in furtherance of the Plan.

**5.20** **Jurisdiction**. The entry of a Confirmation Order shall not diminish or impair the Court's subject matter jurisdiction. Until the entry of a final decree, the Court shall retain subject matter jurisdiction of the Chapter 11 Case, and all proceedings arising therein or related thereto, including proceedings that aid the consummation of the Plan, to the fullest extent permissible under applicable law. Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction over:

(i) *Claims*. To determine the allowance, classification, or priority of Claims against the Debtor;

23

(ii)  **Actions**.  To determine all applications, motions, adversary proceedings, contested matters, Litigation Claims, and any other litigated matters instituted in the Chapter 11 Case or on behalf of the Debtor or the Liquidation Trust;

(iii)  **Professional Fees**.  To determine any and all applications by Professionals for compensation and reimbursement of expenses before the Effective Date, as provided for in the Plan;

(iv)  **Injunctions**.  To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Court in the Chapter 11 Case on or before the Effective Date;

(v)  **Priority Claims and Administrative Claims**.  To determine the allowance and classification of any Priority Tax Claim, Non-Tax Priority Claims, Administrative Claims, or any request for payment of an Administrative Claim;

(vi)  **Secured Claims**.  To determine the validity, priority or extent of any Secured Claims.

(vii)  **Dispute Resolution**.  To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and the making of distributions thereunder, including, without limitation, any dispute concerning payment of Professional fees and expenses of the Liquidation Trustee;

(viii)  **General Matters**.  To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or may be authorized under provisions of the Bankruptcy Code;

(ix)  **Plan Modification**.  To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purpose;

Active\102192604.v2-9/11/19

(x) **Aid Consummation**. To issue such orders in aid ~~or~~of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any entity, to the full extent authorized by the Bankruptcy Code;

(xi) **Implementation of Confirmation Order**. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(xii) **Enforcement of Orders**. To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

(xiii) **Taxes**. To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xiv) **Post-Effective Date Professionals**. To hear and determine disputes with respect to the Liquidation Trustee's Professionals; and

(xv) **Final Decree**. To enter a Final Decree closing the Chapter 11 Case.

## IV. RISK FACTORS

The proposed Plan has among the following risks: (1) the collection of accounts receivable may be less than expected, which may result in the Bank holding a larger unsecured claim than expected; and (2) the proceeds of avoidable transfers and the D&O Insurance, which are the main sources of funds for unsecured creditors, may not be sufficient to result in meaningful or, possibly, any distributions to general unsecured creditors.

## V. TAX CONSEQUENCES OF PLAN

**Creditors concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisers.** The following are the anticipated tax consequences of the Plan:

Since the Debtor is a non-profit corporation, all federal income tax consequences of the Plan will not affect the Debtor and will be unique to each creditor.

**The above text is only the most basic statement of the anticipated tax**

25

Active\102192604.v2-9/11/19

**consequences of the Plan and does not constitute legal or tax advice. Neither the Debtor nor its counsel are experts in tax matters. Neither the Debtor nor the Debtor's professionals have in any way attempted to provide tax advice to any of the Debtor's creditors. The Plan has been drafted with the goal of providing liquidation of the Debtor's business, and _not_ with the goal of minimizing the potential adverse tax consequences to the Debtor's creditors. Interested parties concerned with how the Plan may affect their tax liability should consult their own professional(s).**

## VI.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in section 1129 of the Bankruptcy Code. These include the requirements that: the Plan must be proposed in good faith; at least one (1) impaired class of claims must accept the Plan, without counting votes of insiders; the Plan must distribute to each creditor at least as much as the creditor would receive in a Chapter 7 case, unless the creditor votes to accept the Plan; and the Plan must be feasible. These requirements are _not_ the only requirements listed in section 1129 of the Bankruptcy Code and they are _not_ the only requirements for confirmation.

### A.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met. Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor has a right to vote for or against the Plan only if that creditor has a claim that is both (1) allowed or allowed for voting purposes, and (2) impaired.

In this case, the Proponents believe that Classes 2, 3, and 4 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Proponents believe that class 1 is unimpaired and that holders of claims in this class, therefore, do not have the right to vote to accept or reject the Plan.

#### 1.    What is an Allowed Claim

Only a creditor with an allowed claim has the right to vote on the Plan. Generally, a

26

claim is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim, unless an objection has been filed to such proof of claim. When a claim is not allowed, the creditor holding the claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case is September 3, 2019. The deadline for filing a governmental proof of claim is October 27, 2019.**

**The deadline for filing an Administrative Claim in this case is October 31, 2019**.

### 2. What is an Impaired Claim

As noted above, the holder of an allowed claim has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in section 1124 of the Bankruptcy Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3. Who is <u>Not</u> Entitled to Vote

The holders of the following six (6) types of claims are *not* entitled to vote:

- Holders of claims that have been disallowed by an order of the Bankruptcy Court;
- Holders of other claims that are not Allowed Claims (as discussed above), unless they have been allowed for voting purposes;
- Holders of claims in unimpaired classes;
- Holders of claims entitled to priority pursuant to sections 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code;
- Holders of claims in classes that do not receive or retain any value under the Plan; and
- Holders of claims for administrative expenses.

**Even if you are not entitled to vote on the Plan, you have a right to object to the**

Active\102192604.v2-9/11/19

confirmation of the Plan.

**B.    Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed in Section VI (B)(2).

**1.    Votes Necessary for Class to Accept the Plan**

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

**2.    Treatment for Nonaccepting Classes**

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by section 1129(b) of the Bankruptcy Code. A plan that binds nonaccepting classes of claims can be confirmed if it meets all the requirements for consensual confirmation except the voting requirements of section 1129(a)(8) of the Code, does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan. **You should consult your own attorney if a "cram down" confirmation will affect your claim, as the variations on this general rule are numerous and complex.**

**C.    Feasibility**

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. (11 U.S.C. § 1129(a)(11).) This provision does not apply because the Plan calls for the liquidation of the Debtor.

**D.    Liquidation Analysis and Best Interest of Creditors Criteria**

28

The Bankruptcy Court must independently determine that the Plan is in the best interest of all classes of Creditors. The "best interest" test requires that a plan provide to each dissenting member of each impaired Class a recovery that has a present value at least equal to the present value of the distribution which each such Creditor would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. In this regard, the central choice is whether it is in the best interest of Creditors to continue with the Liquidation Trustee supervised by the Committee, which under the Liquidation Trust Agreement, will become the Trust Oversight Committee, or to hand over the case to a Court-appointed and Court-supervised trustee.

In performing this analysis, the Bankruptcy Court must determine the amount that would be generated from a Chapter 7 liquidation of the Debtors' assets after deducting the cost of liquidation. The cost of liquidation would include the Trustee's commissions (approximately three to four percent of disbursements), the Trustee's expenses, and fees for counsel and other professionals retained by the Trustee, and Administrative Claims. In addition to liquidating the Debtors' assets, the Trustee must also decide whether to litigate certain claims and possibly other litigation matters, with which he or she will have little initial familiarity as he or she will be new to the case. Generally, no distribution is made in a Chapter 7 case until all assets of the bankruptcy estate and all claims have been liquidated, a process that can take many months and sometimes years. This delay could further impair the value of any distribution made to holders of Claims under a Chapter 7 liquidation.

As the Plan is a liquidation plan, the Proponents are of the opinion that it is unnecessary to prepare an additional analysis of the result that might occur through a liquidation under Chapter 7 of the Bankruptcy Code.

The Proponents believe that if the Bankruptcy Case were converted to Chapter 7, theor if the Court appointed a Chapter 711 Trustee to oversee the final liquidation of the Debtor and the winding up of the Case, the trustee would not have the background information and knowledge of the Bankruptcy Case to pursue efficient recovery of remaining assets or complete claim objections. The Proponents believe that collection of the Debtor's remaining receivables by the

29

Liquidation Trustee acting in the name of the Debtor and using Debtor's collections staff and collections software will materially increase the amount collected over what a ~~Chapter 7~~ trustee could accomplish.  Unsecured creditors benefit if the Liquidation Trustee collects as much of the Bank's receivables as possible, as that reduces the amount of the Bank's unsecured claim and means that more of the assets that the Bank does not have a lien on will be available to unsecured creditors Further, ~~the Chapter 7~~a trustee would need to hire a HIPAA certified person to access the billing and cost records, whereas the Liquidation Trustee will act as a corporate officer and director of the Debtor, which is already HIPAA qualified.  Finally, the Liquidation Trust Agreement provides that the Liquidation Trustee will be compensated by commission according to the same sliding scale as a ~~Chapter 7~~Court-appointed trustee.  Therefore, the costs of liquidating the Debtor's assets via the Liquidation Trust will be no greater than via a Chapter 7 trustee, while the potential recoveries might be significantly greater.

The Proponents also believe that the continuation of the Committee, as the Trust Oversight Committee under the Liquidating Trust Agreement, provides important continuity in terms of the legal work and investigation already conducted by the Committee and its attorneys with respect to the Debtor's historical operations, the legal and factual basis for the assertion of claims against the D&O Insurance, and the pursuit of Avoidance Actions.  The Liquidation Trustee can start to prepare for her takeover of the case prior to the Confirmation Hearing. While she would not start her services until such time as the Plan is confirmed, she can start to think through the issues that are involved, learn the history, and make suggestions for an efficient turnover of operations. The Liquidation Trustee can also engage in advance planning for which if any employees are necessary for the remaining activities, including avoidance action evidence, collections, and other issues that will arise in an organized wind-down of the Debtor. In contrast, if a trustee is appointed by the Court, there would not be the same opportunity to introduce the trustee to the issues remaining in the case until after his or her employment.  If there were a gap in time while the trustee determines what is necessary, some of the remaining critical employees may not be available to work for the trustee.

The court-appointed trustee would also have to take the time to seek authority to

30

Active\102192604.v2-9/11/19

retain employees. The trustee would also need time to understand what assets are important to retain, such as the use of computer programs, server leases, and real property leases if necessary. While some of the costs to the estate of a Court-appointed trustee and a Liquidation Trustee would be similar, such as how much the trustee would be compensated; ultimately creditors will benefit by the continuity that the Liquidation Trustee can bring to this process.

The Plan and Liquidation Trust also streamline the management of the Debtor's liquidation, an advantage that would be lost in a Chapter 7 where every transaction would require the expense of Court approval and extensive notice. Further, it is extremely rare for a Chapter 7 trustee to make interim distribution to creditors, meaning that holders of Allowed Claims will receive no distributions in a Chapter 7 until the cases are fully administered and ready to be closed, which would likely be much longer than it will take for the same creditors to receive at least a partial distribution under the Plan.

The Proponents therefore believe that the liquidation under the Plan will achieve at least the same results as would occur in the conversion of the Case to Chapter 7. The result can be achieved without the duplication of administrative costs that would result from the appointment of a Chapter 7 trustee and the employment of additional professional persons, and the delay attendant with the administration of the assets in Chapter 7.

THE PROPONENTS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE COSTS. ACCORDINGLY, THE PROPONENTS URGE HOLDERS OF CLAIMS IN CLASSES 2, 3, AND 4 TO VOTE TO ACCEPT THE PLAN BY SO INDICATING ON THEIR BALLOTS AND RETURNING THEM AS SPECIFIED IN THE NOTICE.

## VII.    RECOMMENDATION AND CONCLUSION

The Proponents believe that the Plan provides the best possible recoveries for creditors that can be achieved in any reasonable time frame (*but see Risk Factors, Article IV above*)

31

Active\102192604.v2-9/11/19

and that possible alternatives are likely to result in delayed distributions and diminished recoveries for creditors. Therefore, the Proponents urge all Holders of Claims in Classes 2, 3 and 4 to vote to accept the Plan.

Dated: ~~August ~~,~~ September 16, 2019

**TRODELLA & LAPPING LLP**

**WENDEL, ROSEN,** ~~**BLACK & DEAN**~~ **LLP**

By: _/s/ Richard A. Lapping_

Richard A. Lapping
Attorneys for ANKA Behavioral
Health, Incorporated

**FOX ROTHSCHILD LLP**

By: _/s/ Michael A. Sweet_

Michael A. Sweet
Attorneys for the Official Committee of
Unsecured Creditors

**EXHIBIT 1 FOLLOWS**

**EXHIBIT 1 TO DISCLOSURE STATEMENT**

**DEFINED TERMS AND RULES OF INTERPRETATION**

As used herein, capitalized terms have the meanings set forth below. Any term that is not otherwise defined herein, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**5.21    Definitions**

**"90 Day Challenge Period"** means the 90-day period from June 14, 2019, to September 12, 2019, during which the Committee may challenge, seek to avoid or otherwise object to the Bank Claim as set forth in the Cash Collateral Orders.

**"Accounts Receivable"** means all of Debtor's accounts receivable.

**"Administrative Claim"** means a Claim for a cost or expense of administration of the Chapter 11 Case allowable under sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including: (i) any actual and necessary cost and expense, incurred by the Debtor after the Petition Date, of preserving the Estate and operating the Debtor's business, including wages, salaries or commissions for services rendered after the commencement of the Case; (ii) Professional Fee Claims; and (iii) all fees and charges properly assessed against the Estate pursuant to 28 U.S.C. § 1930.

**"Administrative Claims Bar Date"** means October 31, 2019 the date that is thirty (30) days after the Effective Date, the date by which all unpaid Administrative Claims arising prior to the Effective Date shall be filed with the Bankruptcy Court or be forever barred.

**"Aggregate Liquidation Proceeds"** means all available Cash on hand as of the Effective Date in addition to Cash to be received by the Liquidation Trustee from the resolution of Litigation Claims and the sale or disposition of all of the Debtor's remaining Assets (other than the Bank Real Property Collateral), Net of Liquidation Trustee Expenses.

**"Allowed Claim"** means a Claim: (a) scheduled by the Debtor as undisputed, not contingent and liquidated; (b) as to which no objection or request for estimation has been filed on or before the

33

Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court; (c) as to which any objection has been settled, waived, withdrawn or denied by a Final Order; or (d) that is Allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim and the Debtor, or (iii) pursuant to the Plan. For the purpose of computing distributions under the Plan, Allowed Claims shall not include penalties, punitive damages or interest with respect to such Claim accruing from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code, or as otherwise expressly set forth in the Plan.

**"Assets"** means all of the assets, property, interests, and effects, Cash, receivables, real and personal, tangible and intangible, wherever situated, of Debtor, as they existed on the Effective Date or thereafter, including all of the Debtor's other non-Cash property and assets, including all of the Litigation Claims, Accounts Receivable and Real Property.

**"Avoidance Actions"** means all claims, rights, and causes of action of Debtor's Estate under the Bankruptcy Code, including but not limited to those set forth in sections 506(c), 506(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553, or their state law analogs, regardless of whether or not such actions have been commenced prior to the Effective Date.

**"Bank"** means the Bank of Guam.

**"Bank A/R Collateral"** means all Accounts Receivable securing the Bank Claim under the Bank Lien Documents.

**"Bank Claim"** means all Claims of the Bank under the Bank Lien Documents.

**"Bank Collateral"** means all Assets securing the Bank Claim under the Bank Lien Documents, and includes the Bank Real Property Collateral and the Bank A/R Collateral.

**"Bank Gap Claim"** has the meaning assigned to it in Section 3.3(i) of the Plan.

**"Bank Lien"** has the meaning ascribed to it in the Cash Collateral Orders.

**"Bank Lien Documents"** has the meaning ascribed to it in the Cash Collateral Orders.

**"Bank Pre-Effective Date Payments"** has the meaning assigned to it in Section 3.3(i) of the Plan.

**"Bank Real Property Collateral"** means all Real Property securing the Bank Claim under

34

the Bank Lien Documents.

**"Bank Replacement Liens"** has the meaning ascribed to it in the Cash Collateral Orders

**"Bank Secured Claim"** means the Secured Claim of the Bank that is Allowed pursuant to Section 3.3(i) of the Plan.

**"Bank Unsecured Claim"** has the meaning assigned to it in Section 3.3(i) of the Plan.

**"Bankruptcy Code"** means title 11, United States Code, as now in effect or hereafter amended.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Northern District of California, which has jurisdiction over the Chapter 11 Case pursuant to section 1334 of title 28 of the United States Code and the reference from the United States District Court for the Northern District of California pursuant to its General Order No. 24 as amended February 22, 2016.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules of the Bankruptcy Court, as now in effect or hereafter amended.

**"Cash"** means legal tender of the United States of America and equivalents thereof.

**"Cash Collateral Orders"** means the *Interim Order Granting Debtor's Motion for Approval of Stipulation for Interim and Final Order (I) Authorizing Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Bankruptcy Rule 4001 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 and Setting Final Hearing Thereon* [entered May 16, 2019, at Docket No. 58], and the *Order After Final Hearing Approving Amended Stipulation (I) Authorizing Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Bankruptcy Rule 4001 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363* [entered July 14, 2019, at Docket No. 165].

**"Chapter 11 Case"** means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor in the Bankruptcy Court and assigned Case No. 19-41025.

**"Claim"** shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

**"Claims Objection Deadline"** means the ~~last day for Filing objections to Claims established by Bankruptcy Local Rule 3003-1~~date that is ninety (90) days after the Effective Date.

**"Class"** means a category of Holders of Claims as described in Article II of the Plan.

35

**"Committee"** means the Official Committee of Unsecured Creditors, appointed by the Office of the United States Trustee in the Bankruptcy Case, as its membership may be revised from time to time under applicable bankruptcy procedures.

**"Committee Counsel"** means Fox Rothschild LLP.

**"Confirmation Date"** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**"Confirmation Hearing"** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**"Debtor"** has the meaning assigned to it in the Introduction.

**"Debtor's Accountants"** means BPM LLP.

**"Debtor's Counsel"** means Trodella & Lapping and/or Wendel Rosen.

**"Disbursing Agent"** means the Person or Entity that may be designated in the Liquidation Trust Agreement and/or Confirmation Order to make distributions under the Plan.

**"Disclosure Statement"** means that certain document as defined in section 1125(b) of the Bankruptcy Code relating to the Plan, including all exhibits and schedules thereto, as will be filed separately and as thereafter amended or supplemented from time to time, and as approved by order of the Bankruptcy Court.

**"Disputed Claim"** means any Claim (a) as to which the Debtor or Liquidation Trustee has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, (b) scheduled as disputed, unliquidated or contingent, or not scheduled, (c) subject to setoff, recoupment or any avoidance action arising under sections 544-550 of the Bankruptcy Code, or (d) otherwise disputed by the Debtor in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order.

**"Distribution Date"** means any date, after the Effective Date, upon which the initial and all

Active\102192604.v2-9/11/19

subsequent distributions will be made to or on account of the Holders of Allowed Claims pursuant to the provisions of the Plan.

**"Effective Date"** means the first date on which all of the conditions precedent described in Section 5.1 of the Plan have occurred or have been waived in accordance with Section 5.1 of the Plan. The Plan Proponents shall give notice of the Effective Date pursuant to Bankruptcy Rule 3020(c)(2).

**"Estate"** means the Debtor's estate created under section 541 of the Bankruptcy Code.

**"Estate Professionals"** means, collectively, Debtor's Counsel, Debtor's Accountants and Committee Counsel.

**"Estate Professional Fee Claims"** means, collectively, all Allowed Administrative Claims fees for services rendered and reimbursement of expenses incurred by the Estate Professionals until and including the Effective Date.

**"Estimated"** means, with respect to the Bank Unsecured Claim, estimated by the Bankruptcy Court at the Confirmation Hearing pursuant to Bankruptcy Code section 502(c).

**"File, Filed or Filing"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

**"Final Order"** means an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue or rehear shall have been waived in writing in form and substance satisfactory to the Plan Proponents or, in the event that an appeal, writ of certiorari or reargument or rehearing thereof has been sought, such appeal, writ of certiorari or reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or motion for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

**"General Unsecured Claim"** means a Claim that is not an Administrative Claim, a Priority

37

Tax Claim, a Non-Tax Priority Claim, or a Secured Claim. A Claim arising from the rejection of an executory contract or unexpired lease, and Claims allowable under section 502(h) of the Bankruptcy Code shall be General Unsecured Claims.

**"Holder"** means, when used in reference to a Claim, an Entity, Person or Governmental Unit that owns such Claim.

**"Impaired"** means, when used in reference to a Claim, a Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**"Interest"** means the legal, equitable, contractual and other rights of the Holders of any shareholder interests in the Debtor. ~~There~~However, there are no Interests or Holders of Interests because Debtor is a California domestic nonprofit corporation.

**"Lien"** shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

~~**"Liquidation Proceeds"** means all available Cash on hand as of the Effective Date in addition to Cash to be received from the resolution of Litigation Claims and the sale or disposition of the Assets and all of the Debtor's remaining Assets including all interests therein, Net of expenses (including professional fees and expenses) of such resolution and disposition.~~

**"Liquidation Trust"** means a liquidating trust that will be established for the benefit of Holders of Allowed Claims pursuant to the Plan and in accordance with the terms of the Liquidation Trust Agreement.

**"Liquidation Trust Agreement"** means the Liquidation Trust Agreement that will establish the Liquidation Trust subject to amendment not later than five days before the Confirmation Hearing. A copy of the Liquidation Trust Agreement is attached to the Plan as **Exhibit A**.

**"Liquidation Trustee"** means the person or entity who shall become trustee of the Liquidation Trust upon the Effective Date.

**"Liquidation Trustee Expenses"** means all costs and expenses incurred by the Liquidation Trustee in administering and/or liquidating the Liquidation Trust, other than the Liquidation Trustee Legal Professional Fee Expenses.

**"Liquidation Trustee Legal Professionals"** means all attorneys hired by the Liquidation

38

Trustee to assist in administering and/or liquidating the Liquidation Trust.

"**Liquidation Trustee Legal Professional Fee Expenses**" means all amounts owing to the Liquidation Trustee Legal Professionals in fees for services rendered and reimbursement of expenses incurred. For avoidance of doubt, no Liquidation Trustee Legal Professional Fee Expenses shall be paid until all Allowed Administrative Claims (including all Estate Professional Fee Claims), Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, and Allowed Secured Claims (including the Bank Secured Claim) have been satisfied in full as provided in the Plan.

"**Litigation Claims**" means any Claim, Avoidance Action, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, ~~assertible~~assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, including but limited to any and all claims against the Debtor's former officers that are covered under policies of insurance.

"**Net**" means, with respect to Cash proceeds received from the disposition or collection of any particular asset, the Cash proceeds remaining after payment of (i) all taxes related to the disposition or collection of such assets, (ii) any incurred or anticipated costs of administering the Liquidation Trust, and (iii) all costs and expenses related to the ~~Disposition~~disposition, collection, enforcement, settlement, pursuit, improvement, maintenance, and operation of such assets, including, without limitation, brokers' fees and expenses and attorneys' fees and expenses.

"**Non-Tax Priority Claim**" means a Class 1 Claim, other than an Administrative Expense Claim or Priority Tax Claim, that is entitled to priority in payment pursuant to sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

"**Other Secured Claim**" means a Secured Claim other than the Bank Claim.

"**Petition Date**" means April 30, 2019, the date on which the Debtor filed its petition for relief commencing the Chapter 11 Case.

39

Active\102192604.v2-9/11/19

"**Plan**" means the Plan and all supplements, appendices and schedules ~~hereto~~thereto, either in its present form or as the same may be altered, amended or modified from time to time.

"**Plan Proponents**" means the Debtor and the Committee.

"**Priority Tax Claim**" means a Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"**Professional**" means (a) any professional employed in the Chapter 11 Case pursuant to section 327 or 1103 of the Bankruptcy Code or otherwise, and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

"**Professional Fee Fund**" means a segregated fund created after the Effective Date by the Liquidation Trustee from: (a) 37% of the Aggregate Liquidation Proceeds, if and when collected, up to an aggregate of the Professional Fee Carve Out Fund Cap, until the date that the Bank Gap Claim has been satisfied in full; and, then, thereafter (b) 97% of all Aggregate Liquidation Proceeds, if and when collected, until the Estate Professional Fee Claims have been satisfied in full.

"**Professional Fee Carve Out Fund Cap**" means $185,000.00.

"**Real Property**" means all of Debtor's real property interests.

"**Real Property Collateral Proceeds**" means the proceeds generated from the sale of Debtor's interest in real property as well as rent and mortgage payments.

"**Record Date**" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

"**Replacement Liens**" has the meaning ascribed to it in the Cash Collateral Orders.

"**Replacement Lien Collateral**" means all Assets securing the Replacement Liens, as identified in the Cash Collateral Orders.

"**Secured Claim**" means a Claim that is secured by a Lien on property in which the Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Debtor's Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a)

40

of the Bankruptcy Code or, in the case of a setoff, pursuant to section 553 of the Bankruptcy Code.

**"Specific Liquidation Proceeds"** means Cash to be received by the Liquidation Trustee from the sale or disposition of specific Assets, Net of the Liquidation Trustee Expenses.

**"Trust Assets"** means all Assets of the Estate that will be transferred to the Liquidation Trust, including the Liquidation Proceeds and all other property of the Estate.

**"Unimpaired Claim"** means a Claim that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**"Unsecured Claim Fund"** means a segregated fund created after the Effective Date by the Liquidation Trustee from: (a) 3% of the Aggregate Liquidation Proceeds, if and when collected, until the date that all Allowed Administrative Claims (including all Estate Legal Professional Fee Claims), Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, and Allowed Secured Claims (including the Bank Secured Claim) have been satisfied in full as provided in the Plan; and, then, thereafter (b) 100% of all Aggregate Liquidation Proceeds, Net of the Liquidation Trustee Legal Professional Fee Expenses and Liquidation Trustee compensation, if and when collected.

**5.22** **Rules of Interpretation and Computation of Time**. For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or schedule, Filed or to be Filed, means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim includes that entity's successors and assigns; (e) all references in the Plan to Sections, Articles and Schedules are references to Sections, Articles and Schedules of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the

41

1  Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code and in the

2  Bankruptcy Rules will apply; and (i) in computing any period of time prescribed or allowed by the

3  Plan, the provisions of Bankruptcy Rule 9006(a) and Bankruptcy Local Rule 9013-3(a) will apply.

***

Active\102192604.v2-9/11/19